1

UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

GAIL ELIZABETH WALASHEK,
Individually and as successor-in-
interest to THE ESTATE OF
MICHAEL WALASHEK and THE
ESTATE OF CHRISTOPHER
LINDEN, et al.,

Case No.:  **14cv1567 BTM(BGS)**

4

5

**ORDER DENYING <u>DAUBERT</u>
MOTIONS RE: EDWIN C.
HOLSTEIN, M.D. AND MICHAEL
CLAUDE FISHBEIN, M.D.**

6

Plaintiffs,

7

v.

8

AIR LIQUID SYSTEMS
CORPORATION, et al.,

9

10

Defendants.

11

12

Defendant Foster Wheeler LLC ("Foster Wheeler") has filed motions to

13

exclude expert opinion testimony from Edwin C. Holstein, M.D., and Michael

14

Claude Fishbein, M.D.  Defendants Parker-Hannifin Corporation, Cleaver-Brooks,

15

Inc., Plant Products & Supply Co., Lamons Gasket Company, Fraser Boiler

16

Service, Inc., and M. Slayen and Associates, Inc., have joined in the motions.  On

17

January 27, 2016, the Court heard oral argument on the motions.  For the reasons

18

set forth below, the motions to exclude expert opinion testimony are **DENIED**.

19

//

20

//

1

14cv1567 BTM(BGS)

# I. **BACKGROUND**

On June 17, 2014, Plaintiffs commenced this wrongful death and survival action in state court.  On June 27, 2014, this action was removed to federal court.

The Complaint alleges that Michael Walashek's exposure to asbestos and asbestos-containing products, in the course of performing his work for various employers, caused him to suffer severe and permanent injury and ultimately death. The Complaint asserts claims of negligence and strict liability.

Michael Walashek was a career boilermaker.  Plaintiffs allege that between 1967 and 1986, Walashek was exposed to asbestos while performing maintenance, repair, overhaul, break-down, and rebuilding of boilers and associated equipment installed on naval, commercial, and industrial vessels. Walashek performed his work aboard vessels, including the USS Kitty Hawk and USS Constellation, as well as in repair shops at various land-based sites.

In February 2013, Walashek sought treatment for shortness of breath and left-sided chest pain.  A CT scan revealed pleural fluid and a large and extensive confluent mass over the left upper lung extending through the left chest wall. Walashek died in March 2013 at the age of 64.  Walashek is survived by his wife, Gail Walashek, and his adult children.

2

## II.  DISCUSSION

Defendants seek to preclude the expert testimony of Dr. Fishbein and Dr. Holstein on the ground that their opinions do not satisfy the requirements of Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 50 U.S. 579 (1993).  As discussed below, the Court finds that the proffered expert testimony of Dr. Fishbein and Dr. Holstein is relevant and reliable, and is therefore admissible.

A.  Governing Law

Federal Rule of Evidence 702 permits expert testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, expert testimony must be both relevant and reliable.  Daubert, 509 U.S. at 589; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).  The trial court must act as a "gatekeeper" to exclude expert testimony that does not meet Rule 702's reliability standards.  Kumho Tire, 526 U.S. at 147-48.

With respect to relevance, there must be a "valid scientific connection to the pertinent inquiry" in order for Rule 702's "helpfulness" standard to be met.  Daubert, 509 U.S. at 592.

3

As for reliability, the Court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue. Daubert, 509 U.S. at 592-93.  In Daubert, the Supreme Court listed several factors that *may* be pertinent in assessing reliability:  (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community.  Id. at 593-94.

The inquiry under Rule 702 is a "flexible" one, and the district court has "the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case."  Kumho Tire, 526 U.S. at 158.  Accordingly, the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.  Id. at 150.

Importantly, the focus of the court's gatekeeping inquiry "must be solely on principles and methodology, not the conclusions that they generate."  Daubert, 509 U.S. at 595.  "When an expert meets the threshold established by Rule 702 . . . the expert may testify and the jury decides how much weight to give that testimony."  Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010).

4

1  B.  Dr. Fishbein

2      Defendants seek to exclude Dr. Fishbein's diagnosis of mesothelioma on the

3  grounds that (1) his pathological opinions are not scientifically valid and (2) his

4  differential diagnosis is impermissibly speculative. However, for the most part, it

5  seems that Defendants disagree with Dr. Fishbein's *conclusions*, not the reliability

6  of the scientific methodology underlying his conclusions.

7      Dr. Fishbein has been a professor of pathology and medicine at the UCLA

8  Medical Center since 1997.  (Pl. Ex I at 1.)  He was head of pulmonary pathology

9  from 1997-2009.  (Id.) Because UCLA is a major center for thoracic surgery, he

10  has seen over a thousand cases of thoracic neoplasms, including carcinomas of

11  the lung and mesotheliomas.  (Id.)

12      In his report, Dr. Fishbein concluded:

13  In light of the histologic findings observed, and the
    immunohistochemical staining pattern, it is my opinion that more likely
14  than not, this neoplasm represents a malignant mesothelioma, mixed
    type, with a primarily high grade epithelial component, and a minor
15  spindle cell component, so-called biphasic mesothelioma.  While the
    immunostaining pattern is not specific, nor diffuse, there are at least
16  focal positive cells that are consistent with cells of mesothelial origin
    and support the diagnosis of mesothelioma: WT1, calretinin, Keratin
17  5/6, and D2-40.  . . . There are no stains that point to an epithelial
    neoplasm, such as a lung cancer.  While the clinical findings did not
18  enter into the pathologic assessment, the clinical history of asbestos
    exposure, and the collagenous plaque in the pleural observed on CT
19  scan that also indicates asbestos exposure, add support to the
    pathologic diagnosis of mesothelioma.

20

5

14cv1567 BTM(BGS)

1   (Pl.  Ex. I at 3.)

2        Dr. Fishbein's opinion was based in part on results of immunohistochemical

3   stains ordered by him as well as previous medical providers.  He observed rare

4   positive cells for CK 5/6 in a cytology specimen.  (Pl. Ex. I at 3.)  Biopsy slides

5   showed "relatively rare neoplastic-appearing cells with distinct nuclear positivity"

6   in the WT-1 stain and "rare epithelioid and spindle cells with nuclear and

7   cytoplasmic positivity" in the calretinin stain.  (Id. at 2.)  With respect to the stains

8   done at UCLA, Dr. Fishbein found rare focal positive staining for WT-1 and rare

9   focal positive staining for D2-40.  (Fishbein Dep. (Pl. Ex. H) at 93:20-94:1; 98:15-

10  99:1.)  Dr. Fishbein explained that "rare" meant "less than 10 percent, probably

11  less than 5 percent of cells."  (Fishbein Dep. at 92:5-6.)

12       Defendants contend that Dr. Fishbein's diagnostic finding of mesothelioma

13  is not supported by his "rare positive" findings.  Defendants rely on the "WHO

14  Classification of Tumours of the Lung, Pleura, Thymus and Heart" (Def. Ex. 2),

15  which indicates that for mesothelioma, there is over 90% sensitivity for calretinin,

16  75-100% sensitivity for CK5/6, 70-95% for WT1, and 90-100% sensitivity for D2-

17  40.

18       Defendants also rely on the Guidelines for Pathologic Diagnosis of Malignant

19  Mesothelioma  (the "Guidelines") (Def. Exs. 3-4), which explain that calretinin "can

20  be demonstrated in nearly all epithelioid mesotheliomas when antibodies to human

6

14cv1567 BTM(BGS)

recombinant calretinin are used.  The staining is often strong and diffuse, and both nuclear and cytoplasmic.  Five percent to 10% of lung adenocarcinomas are positive, but the staining is usually focal."  (Def. Ex. 4 at 657, Table 5.)  The Guidelines state that CK5/6 is "expressed in 75% to 100% of the mesotheliomas. Approximately 2% to 20% of lung adenocarcinomas can be focally positive."  (Id.) For WT-1, "[a]pproximately 70% to 95% of the mesotheliomas show nuclear positivity.  Lung adenocarcinomas are negative," and for D2-40, "approximately 90% to 100% of mesotheliomas show positivity along the cell membranes.  Up to 15% of lung adenocarcinomas are focally positive."

Defendants place great weight on the following language in the Guidelines for Pathologic Diagnosis of Malignant Mesothelioma:  "Another problem associated with immunohistochemistry may be putting too much emphasis on focal immunopositivity.  We would suggest that weak or focal staining of fewer than 10% of the cells should be considered as being negative when interpreting a panel of stains."  (Def. Ex. 4 at 665.)

Based on the Guidelines, Defendants argue that the stains for WT1, calretinin, CK5/6, and D2-40 were not truly positive, as they should have been, and therefore cannot support a diagnosis of mesothelioma.  But the Guidelines state that they are meant to be "a reference for the pathologist, rather than a mandate or review of the literature."  (Id. at 648.)  Furthermore, "On occasion, a

14cv1567 BTM(BGS)

1  tumor may not stain with any marker.  This lack of staining can be caused by a

2  variety of reasons . . . ." (Id. at 656.)

3        In his deposition, Dr. Fishbein stated that he believed that the staining results

4  were not stronger because the sample was very small, Walashek's tumor was

5  poorly differentiated, and there was a lot necrosis in the tumor resulting in the

6  degeneration of cells.  (Fishbein Dep. at 81:12-17; 163:7-18.)  Nonetheless, Dr.

7  Fishbein found that the staining results were useful when viewed as part of the

8  "entire picture." (Id. at 74:9-13.)

9        In reaching his diagnosis, Dr. Fishbein also relied on clinical and radiologic

10  information.   Dr. Fishbein considered that Walashek had no prior history or

11  evidence of cancer, had a pleural effusion, had a neoplasm that formed a rind

12  around his lung that infiltrated his chest wall, and had no signs or symptoms or

13  history of a neoplasm anywhere else, including the lung.  (Id. at 62:12-63:-25.)  The

14  Guidelines themselves state, "The diagnosis of MM should always be based on

15  the results obtained from an adequate biopsy . . . in the context of appropriate

16  clinical, radiologic, and surgical findings." (Def. Ex. 4 at 648.)  The Summary of

17  the Guidelines reiterates, "The pathologist should always take the clinical,

18  radiologic, and pathologic features into consideration and get expert second

19  opinion in difficult cases, as necessary." (Id. at 665.)

20

8

1    Dr. Fishbein also took into consideration negative Ber-EP4 and B72.3 stain

2    results.  He explained, "There are no stains that point to an epithelial neoplasm,

3    such as a lung cancer."  (Pl. Ex. I at 3.)

4    Defendants do not suggest that immunohistochemical staining is not a

5    reliable scientific methodology.  Rather, Defendants disagree with Dr. Fishbein's

6    interpretation of the test results.  Defendants' disagreement with Dr. Fishbein's

7    conclusions is not a basis to exclude his opinion.

8    Defendants also argue that Dr. Fishbein's differential diagnosis of

9    mesothelioma is speculative.  However, as discussed above, Dr. Fishbein relied

10   on the stain results as well as clinical and radiologic data in forming his diagnosis

11   of mesoltehlioma and ruling out lung cancer or other epithelial neoplasm.   A

12   reliable differential diagnosis passes muster under Daubert.  Clausen v. M/V New

13   Carissa, 339 F.3d 1049, 1058 (9th Cir. 2003); see also Kennedy v. Collagen Corp.,

14   161 F.3d 1226 (9th Cir. 1998) (holding that expert opinion that a collagen product

15   caused the plaintiff's auto-immune disorder was reliable and admissible where it

16   was "based on his knowledge of the connection between collagen and various

17   autoimmune disorders, combined with his observation of Mrs. Kennedy's injuries

18   and her medical history and laboratory tests.").

19

20

14cv1567 BTM(BGS)

Dr. Fishbein's diagnosis of mesothelioma is clearly relevant and is also based on scientifically valid methodology.   Therefore, his expert opinion is admissible.[1]

## C. Dr. Holstein

Foster Wheeler moves to preclude Dr. Holstein from providing expert opinion testimony to the trier of fact opining that: (1) Walashek suffered from mesothelioma; (2) Walashek was exposed to asbestos from any product attributable to Foster Wheeler; and (3) that Foster Wheeler was a "substantial factor" in causing Walashek's disease.  The Court denies this motion in its entirety.

Dr. Holstein is board certified in internal medicine, as well as in preventive medicine, with a subspecialty in Occupational Medicine.  (Def. Ex. 2 at 1.)  He trained with noted asbestos authority Dr. Irving Selikoff from 1974 to 1976 and served as a full-time faculty member at the Mount Sinai School of Medicine from 1976 to 1984.  (Id. at 2.)  From 1976 to 1984, he was deeply involved in original research on the health effects of asbestos.  (Id.)  He has personally examined

---

[1] Foster Wheeler objects to evidence attached to the Barrow Declaration in support of Plaintiffs' Opposition.  Specifically, Foster Wheeler objects to Exhibit K (medical records), Exhibit L (deposition of Dr. Moran), Exhibit M (death certificate), Exhibit N (Dr. Kradin's expert report), Exhibit O (Dr. Sheibani's expert report), and Exhibit P (deposition of Dr. Sheibani). The Court does not rely on this evidence in reaching its decision and therefore overrules the objections as moot.

10

14cv1567 BTM(BGS)

1   several thousand patients who have experienced exposures to asbestos and has

2   also reviewed records and/or x-rays of other patients with exposures to asbestos.

3   (Id.)   Since 1984, he has served as a consultant on matters related to

4   environmental health, and his work has regularly included the assessment of the

5   amount of exposure a person or population has received to a toxic substance, and

6   the likely health effects of that exposure.  (Id.)

7         In his report, Dr. Holstein states:

8         Based on the information available to me, it is my opinion, with a
      reasonable degree of medical certainty, that Mr. Michael Walashek
9     experienced significant exposures to asbestos in his work as a
      welder/boilermaker, beginning no later than 1972 and continuing at
10    least into the 1980's.  His asbestos exposures arose primarily from
      asbestos-containing insulating materials, refractories, and gaskets.
11    Mr. Michael Walashek's multiple exposures to asbestos in this work
      cumulatively constituted the direct and sole cause of his calcified
12    pleural plaques, and of his epithelial malignant mesothelioma.  This
      cancer in turn was the direct cause of his death.
13        Based on the testimony of the co-workers, as well as the
      industrial hygiene literature and the medical literature on the dose-
14    response relationship between exposure to asbestos and development
      of malignant mesothelioma, it is my opinion that Mr. Walashek's
15    exposures to asbestos specifically in connection with his work with
      Foster Wheeler boilers constituted a substantial factor in the causation
16    of his calcified pleural plaques and his malignant mesothelioma.

17   (Def. Ex. 2 at 6-7.)  Dr. Holstein also opines that it appears that Walashek was

18   exposed to asbestos dust from products supplied by M. Slayen, Plant Products

19   and Supply, and Lamons Gaskets, and that those exposures separately

20

11

14cv1567 BTM(BGS)

constituted a substantial factor in the causation of his calcified pleural plaques and malignant mesothelioma.

First, Foster Wheeler argues that Dr. Holstein, an internist, does not have the requisite medical qualifications to make a diagnosis of disease. Foster Wheeler argues that because Dr. Holstein is not a pathologist or pulmonologist and has not personally examined any pathology material in this case, Dr. Holstein is not qualified to provide an opinion regarding Mr. Walashek's pathologic diagnosis.

Plaintiffs clarify that Dr. Holstein's opinion is not being offered as an opinion of a pathologist or pulmonologist. (Opp. at 13:13-17.) Nevertheless, Dr. Holstein, as a trained physician who has reviewed pertinent medical records and pathologic findings, may state his opinion regarding Mr. Walashek's diagnosis. See Holbrook v. Lykes Bros. Steamship Co., Inc., 80 F.3d 777 (3d Cir. 1995) (holding that the district court erred in finding that a treating physician was not qualified to render a diagnosis because he was not a pathologist or oncologist and relied on a pathology report prepared by someone else).

Foster Wheeler also disputes the accuracy of the underlying facts upon which Dr. Holstein bases his opinion. Specifically, Foster Wheeler contends that there is insufficient evidence that Walashek worked with Foster Wheeler's asbestos products as opposed to replacement parts. However, this factual dispute

12

1  is not a proper ground for excluding the testimony of Dr. Holstein.  The sufficiency

2  of the evidence should be determined in connection with the pending motions for

3  summary judgment, if appropriate, or at trial.  See, e.g., Wilbur v. City of Mount

4  Vernon, 2013 WL 1774624, at * 2 (W.D. Wash. Apr. 25, 2013) ("[W]hile defendants

5  are free to challenge the accuracy of certain facts underlying Jackson's opinion at

6  trial, such a challenge will go to the weight to be given the testimony, rather than

7  its admissibility."); In re Levaquin Prod. Liab. Lit., 2010 WL 8399942, at * 4 (D.

8  Minn. Nov. 4, 2010) ("Disputes about the facts underlying an expert's opinions are

9  best addressed through the adversarial process and then by the jury as the

10  ultimate fact-finder.").

11      Finally, Foster Wheeler argues that Dr. Holstein's causation opinions are

12  scientifically deficient and directly contradict California's causation standard.

13  Under California law, after a plaintiff establishes some threshold exposure to the

14  defendant's asbestos-containing product, the plaintiff must further establish in

15  reasonable medical probability that a particular exposure or series of exposures

16  was a "legal cause" of his injury – i.e., a substantial factor in bringing about the

17  injury.  Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 982 (1997).  The

18  California Supreme Court explains:

19      In an asbestos-related cancer case, the plaintiff need not prove that
        fibers from the defendant's product were the ones, or among the ones,
20      that actually began the process of malignant cellular growth. Instead,

13

14cv1567 BTM(BGS)

1
2

the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it contributed to the plaintiff or decedent's risk of developing cancer.

3

Id.

4
5
6

Foster Wheeler contends that Dr. Holstein endorses an "every-exposure" theory that has been rejected by other courts.  The Court does not agree that Dr. Holstein endorses an "every-exposure" theory in this case.

7
8
9
10
11
12
13
14

Dr. Holstein explains that "[a]s each exposure to asbestos contributes to the total amount of asbestos that is inhaled, and in so doing shortens the necessary period for asbestos disease to develop, each *significant exposure* to asbestos is therefore a substantial contributing factor in the development of the malignant mesothelioma or lung cancer that actually occurred, when it occurred, in a given patient."  (Def. Ex. 2 at 22.) (Emphasis added.)  Dr. Holstein repeats several times that all "significant exposures" contribute to the causation of a subsequent mesothelioma or lung cancer.  He specifically states:

15
16
17
18

[T]here are some exposures to asbestos that are so brief, of such low air concentration, or otherwise of such trivial nature that they cannot reasonably be held on a probability basis to have contributed to a subsequent mesothelioma or lung cancer in a specific individual. Among such exposures are those to the extremely low amounts of asbestos in ambient air.

19

(Def. Ex. 2 at 27.)

20

14

1    Defendants point to the following deposition testimony of Dr. Holstein as

2  proof that he espouses an "every-exposure" theory:

3    Q.  You've previously testified that each and every exposure above
     background increases the risk for the development of mesothelioma,
4    correct?

5    A. Yes.

6    Q. Is that still your opinion?

7    A.  Well, I would include background.  I don't say that it's limited to
     those exposures above background.  I would also include background
8    exposures as increasing the risk.

9    Q.  All right.  And you've previously testified that it's your belief that
     every exposure, no matter how minimal, causes or contributes to the
10   development of disease.  Is that still your opinion?

11   A.  I don't know where you're quoting from.  I would agree insofar as
     my language would be that it contributes to the cause.  I wouldn't --
12   strip the verb out of there, or to be more clear, I wouldn't – it would be
     misleading to say it causes mesothelioma.  Therefore, I would state it
13   as, "contributes to the cause."

14   . . .

15   Q.  Is it your opinion that each and every exposure to asbestos
     increases the risk of developing an asbestos-related disease?
16
     A. Yes.
17
  (Holstein Dep. (Pl. Ex. F) at 76:8-77:2; 78:25-79:3.)    However, Defendants
18
  mischaracterize Dr. Holstein's testimony.   He opines that each exposure to
19
  asbestos contributes to the total dose of asbestos that causes mesothelioma, and
20

15

1   as the total dose of asbestos increases, the average period necessary for the

2   disease to develop shortens.  But this is not to say that every exposure constitutes

3   a "substantial contributing factor" in the development of the disease.  It is only

4   "significant" exposures that are "substantial contributing factors." [2]

5           Defendants argue that even if Dr. Holstein does not espouse an "every-

6   exposure" theory, his opinion is based on conjecture because he cannot define the

7   threshold at which an exposure becomes "significant."  This Court joins the courts

8   that have held that a causation expert's inability to identify a precise threshold for

9   safe exposure goes to weight not admissibility of the expert's testimony.  See

10  Lipson v. On Marine Services Co., LLC, 2013 WL 6536923, at * 4 (W.D. Wash.

11  Dec. 13, 2013) ("The Court concludes that Dr. Brodkin's inability to identify a low

12  threshold or bright line level goes to the weight, not the admissibility, of his

13  testimony); Quirin v. Lorillard Tobacco Co., 2014 WL 716162 (N.D. Ill. Feb. 25,

14

15  _____

16          [2] In Izell v. Union Carbide Corporation, 231 Cal. App. 4th 962 (2014), Union Carbide
    argued that the testimony of plaintiff's expert that "[a]ll of the asbestos together contributes to
    cause mesothelioma," cannot be squared with Rutherford's two-step causation test because if
17  every exposure contributes to the overall increase in risk, the second step would be
    unnecessary.  In rejecting this argument, the California Court of Appeal explained that proof of
18  exposure establishes legal causation only if the jury accepts the expert's testimony, and
    "[n]othing in Rutherford precludes a plaintiff from establishing legal causation through opinion
19  testimony by a competent medical expert to the effect that every exposure to respirable asbestos
    contributes to the risk of developing mesothelioma."  Id. at 977.   The court also noted that the
    expert actually drew distinctions between "significant exposures" that contributed to the plaintiff's
20  risk of contracting the disease and "trivial exposures" that would not have been substantial
    factors increasing his risk.  Id.

16

1  2014) (rejecting argument that expert's testimony should be excluded because he

2  stated that there is no clear threshold for increased risk from asbestos exposure).

3       Next, Defendants argue that Dr. Holstein's opinion is unreliable and contrary

4  to California law because he failed to perform a comparative analysis of

5  Walashek's claimed exposures to determine their significance.  Foster Wheeler

6  contends that Dr. Holstein's failure to conduct any meaningful analysis of the

7  frequency, duration, and intensity of Walashek's exposure to asbestos-containing

8  products attributable specifically to Foster Wheeler, renders Dr. Holstein's

9  causation opinion speculative, unreliable, and inadmissible.

10       However, <u>Rutherford</u> does not contain any requirement that a comparative

11  analysis be conducted.  <u>Rutherford</u> requires only that the plaintiff establish in

12  reasonable medical probability that a particular exposure or series of exposures

13  was a substantial factor contributing the decedent's risk of developing cancer. 16

14  Cal. 4th at 982.

15       The Court finds that Dr. Holstein utilized scientifically valid methods in

16  reaching his conclusion that Walashek's exposure to asbestos attributable to

17  Foster Wheeler was "significant" and was a "substantial contributing factor" to

18  Walashek's mesothelioma.  Dr. Holstein's conclusion rests upon, among other

19  things, the dose-response relationship between asbestos and mesothelioma,

20  which has been established by scientific and medical literature, facts regarding the

17

1   sort of work and duration of the work that Walashek performed, and industrial

2   hygiene data.

3          Based on his understanding of the type and duration of work Walashek

4   performed with and around asbestos attributable to Foster Wheeler, Dr. Holstein

5   concluded that this exposure was "significant."  Dr. Holstein's report summarizes

6   deposition testimony of Frank Walashek, Ron Gray, and James Doud.  (Def. Ex. 2

7   at 5-6.)  Gray recalled the names of 19 ships he worked on with Michael Walashek,

8   16 of which had Foster Wheeler boilers.   Doud and Frank Walashek, also

9   welders/boilermakers, worked with Michael Walashek on various jobs as well.  The

10  three witnesses testified that in the ordinary way of performing their work, they

11  would be exposed to asbestos dust from removing or replacing insulation,

12  refractory, and gasket materials.  Doud recalled an overhaul of a boiler where the

13  demolition phase was especially dusty.  Doud testified that Walashek breathed this

14  dust.  Gray recalled a two-week job on the Kitty Hawk, a three-week replacement

15  of a rear wall tube on a Foster Wheeler boiler, and multi-day repairs of Foster

16  Wheeler boilers on many other ships as well.  It was not uncommon for these men

17  to work 72 or even 84 hour weeks.

18         Dr. Holstein explained that both the data of Mr. Hays (Plaintiffs' industrial

19  hygiene expert) and his own citations "indicate that the air concentrations while

20  tearing out asbestos-containing insulation materials from boilers could easily run

1    into the several hundred fibers per cc of air.  This would be particularly true on

2    ships, where the boilers were certain to be located in poorly ventilated areas." (Def.

3    Ex. 2 at 6.)  In his deposition, Dr. Holstein testified that he did not carry out precise

4    calculations regarding the fibers-per-cc-years that Walashek was exposed to in

5    connection with Foster Wheeler products because his series of exposures in

6    connection with Foster-Wheeler boilers "cumulatively are quite easily and without

7    any doubt whatsoever within the range that is understood, based on the scientific

8    literature, to cause a manifold increase in the risk and, therefore, in the actual

9    occurrence of malignant mesothelioma in people who are so exposed. . . ."

10   (Holstein Dep. at 51:22-52:4.)   Dr. Holstein explained:

11           And the bottom line of the calculation is that, given the kinds of
     exposures to asbestos that occur – that is to say, the typical air
12   concentrations that occur in doing the kind of work I just mentioned –
     that 2.1 hours of such work is sufficient to double the risk of acquiring
13   malignant mesothelioma, based on the science articles – scientific
     articles that report the dose-response relationship between exposure
14   to asbestos and rate of acquiring mesothelioma.
             So if it just requires 2.1 hours of exposure to insulation work, then
15   to make the calculations you ask of me in your question is beside the
     point, because it's so easily and immediately obvious that for a career
16   boilermaker, he exceeded that, and he exceeded it by far.

17   (Id. at 53:8-22.)

18           The Court finds that Dr. Holstein's failure to engage in a comparative

19   analysis of Walashek's claimed exposures does not render his opinion unreliable.

20

                                                    19

                                                                      14cv1567 BTM(BGS)

1   Therefore, the Court denies Foster Wheeler's motion to exclude the testimony of

2   Dr. Holstein.

3

4                             III.  **CONCLUSION**

5        For the reasons discussed above, Foster Wheeler's <u>Daubert</u> Motion re:

6   Michael Claude Fishbein, M.D. [Doc. 374-1] and <u>Daubert</u> Motion re:  Edwin C.

7   Holstein, M.D. [Doc. 374-5] are **DENIED**.

8   **IT IS SO ORDERED**.

9    Dated:  February 16, 2016

10                                              Barry Ted Moskowitz, Chief Judge
                                               United States District Court
11

12

13

14

15

16

17

18

19

20

                                       20

                                                    14cv1567 BTM(BGS)